
B. McKay Mignault, Chief Bankruptcy Judge
United States Bankruptcy Court

**Dated: March 31st, 2022**

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF WEST VIRGINIA
# IN CHARLESTON

| IN RE: | CASE NO. 2:19-bk-20134 |
|---|---|
| COROTOMAN, INC., | CHAPTER 11 |
| Debtor. | JUDGE B. MCKAY MIGNAULT |
| WEST VIRGINIA WATER DEVELOPMENT AUTHORITY, acting on behalf of the WEST VIRGINIA INFRASTRUCTURE AND JOBS DEVELOPMENT COUNCIL and REGIONAL DEVELOPMENT AUTHORITY OF CHARLESTON-KANAWHA COUNTY, WEST VIRGINIA METROPOLITAN REGION, Plaintiffs v. JOHN HARRISON WELLFORD, III, and COROTOMAN, INC., Defendants | A.P. NO. 2:19-ap-2015 |

| |
|---|
| JOHN HARRISON WELLFORD, III, and COROTOMAN, INC., <br><br>    Counter-Claimants <br><br> v. <br><br> WEST VIRGINIA WATER DEVELOPMENT AUTHORITY, acting on behalf of the WEST VIRGINIA INFRASTRUCTURE AND JOBS DEVELOPMENT COUNCIL <br> and <br> REGIONAL DEVELOPMENT AUTHORITY OF CHARLESTON-KANAWHA COUNTY, WEST VIRGINIA METROPOLITAN REGION, <br><br>    Counter-Defendants. |

## MEMORANDUM OPINION AND ORDER

   Pending are cross motions for summary judgment. Defendant Corotoman, Inc. ("Corotoman") filed its Motion for Summary Judgment ("Corotoman MSJ") on September 24, 2021 [dckt. 170], and the West Virginia Water Development Authority acting on behalf of the West Virginia Infrastructure and Jobs Development Council ("WVWDA") and Regional Development Authority of Charleston-Kanawha County West Virginia Metropolitan Region ("RDA") (together, the "Plaintiffs") filed their Response on October 8, 2021 [dckt. 175]. The Plaintiffs filed their Motion for Partial Summary Judgment ("Plaintiffs' MSJ") on September 30, 2021 [dckt. 172]. Corotoman filed its Response on October 27, 2021 [dckt. 178], and the Plaintiffs filed their Reply on November 17, 2021 [dckt. 185]. Notably, Mr. Wellford, Corotoman's Co-Defendant, filed nothing in response to the Plaintiffs' MSJ, and has not filed his own motion for summary judgment.

   This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). The Court has jurisdiction pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.

I.

A.     Facts

On July 23, 1999, RDA purchased the Ticketmaster building at the Northgate business park commercial development in Charleston, West Virginia from Corotoman for $3,810,000, pursuant to a Real Estate Purchase Agreement ("REPA"). Corotoman had built the premises specifically for Ticketmaster, and the building was leased to Ticketmaster by Corotoman via a lease agreement dated January 14, 1999 (the "Ticketmaster Lease"). On August 5, 1999, as part of the transaction, Corotoman executed (i) a deed transferring title to the premises to RDA; and (ii) an Assignment of Lease, in which Corotoman assigned the Ticketmaster Lease to RDA.

RDA obtained the majority of the funds for its purchase through a loan from the WVWDA. From the WVWDA, RDA received $3,000,000 (the "WVWDA Loan"), from the City of Charleston, RDA received $400,000, and from First Community Bank, N.A., RDA received $410,000 (the "Bank Loan"). As collateral, RDA pledged the Ticketmaster premises. RDA intended to repay the loan using rents collected from Ticketmaster. On August 5, 1999, RDA assigned the rent and payments collected from Ticketmaster to the WVWDA. Although the Ticketmaster Lease was assigned to RDA, Corotoman agreed to act as the Landlord and "strictly and timely perform all of the obligations of the Landlord in the Lease," which included the collection of rent and other payments. The REPA required Corotoman to then "promptly pay on behalf of RDA all amounts due" to the WVWDA. Notably, there was a positive difference between the rents collected and the payments due to the WVWDA; Corotoman would use the difference in funds to pay itself landlord expenses (such as snow plowing and janitorial services) and a small monthly compensation.

Furthermore, as consideration under the REPA, Corotoman received the contingent right to repurchase the Ticketmaster building upon and in consideration of the fulfillment of three requirements: (i) payment in full by Corotoman of the WVWDA loan to RDA; (ii) payment or

3

assumption of the Bank Loan; and (iii) payment of foregone real estate taxes set forth in the REPA.

As for the real estate taxes, the REPA required that Corotoman pay to the Kanawha County Sheriff the lesser of: (a) the real property taxes on the Ticketmaster premises for each year the premises was owned by RDA and neither Corotoman nor Ticketmaster was assessed or required to pay those real estate taxes; and (b) an amount equal to half the difference between the fair market value of the Ticketmaster premises and the payoff amount (excluding interest) of the WVWDA Loan and the Bank Loan (together, the "Long Term Loans") plus certain expenses.  This was designed to recapture the value of the real estate taxes that had not been assessed or collected while the Ticketmaster premises was subject to public ownership.

If the Ticketmaster Lease was terminated, Corotoman would be obligated to repurchase the Ticketmaster premises in accordance with the three requirements above.

Importantly, Corotoman's former 100% owner, John H. Wellford, III, personally guaranteed all of Corotoman's obligations.  He did so unconditionally and executed a Guaranty Agreement (the "Wellford Guaranty") in which he guaranteed punctual payment of all debt owed to the WVWDA by the RDA under the WWDA Loan.  Furthermore, the Wellford Guaranty provided the Defendants would be responsible for all costs and expenses that WVWDA incurred to enforce its rights under the WVWDA Loan, the Ticketmaster Lease, or the Wellford Guaranty.

For a while, all went as planned and the Defendants continued to collect the rents from Ticketmaster and remit those funds to the WVWDA.  Eventually, though, while the Defendants continued to collect the rents, it began failing to make the required payments to the WVWDA on behalf of the RDA.  Instead, the Defendants kept approximately $1.5 million in collected rent, and they no longer have possession or control of any rent collected from Ticketmaster.

On October 11, 2016, Michael Thompson of Realcorp, LLC ("Realcorp"), informed Mr. Wellford that Realcorp would consider working with him to purchase the Ticketmaster premises.

4

On May 22, 2017, Mr. Thompson followed that communication up by emailing Mr. Wellford a draft purchase agreement for the Ticketmaster building. The draft agreement listed TOP Properties, LLC ("Top Properties") as the purchaser and "Corotoman, Inc./Regional Development Authority" as the seller. After asking for clarification regarding the actual ownership of the Ticketmaster premises, Mr. Thompson was sent a proposed deal structure (the "Proposed Deal") by Mr. Wellford. The Proposed Deal had six steps: (1) RDA would sell the Ticketmaster Premises to Corotoman; (2) RDA would take a note from Corotoman for $2,000,000; (3) Corotoman would sell the Ticketmaster premises to TOP Properties; (4) Corotoman would receive $2,000,000 from TOP Properties; (5) Corotoman would pay RDA $2,000,000; and (6) TOP Properties would sell the Ticketmaster premises to RDA, retaining the right to repurchase the same. Mr. Wellford and Mr. Thompson continued to correspond about the transaction during 2017 and 2018, but no provision was ever suggested regarding the payment of the foregone real estate taxes, and no signed, finalized purchase agreement has ever been provided by either Mr. Wellford or Realcorp.

Sometime around June of 2017, Mr. Wellford notified the Kanawha County Attorney (Marc Slotnik) that Corotoman was contemplating a transaction involving the Ticketmaster premises. Mr. Slotnick subsequently informed Mr. Wellford and Corotoman that any proposal relating to that premises must be made in writing to the Kanawha County Commission, which would address the request at a public meeting. The Plaintiffs note that the Defendants have never produced any evidence showing that they formally provided any written statement regarding the Proposed Deal to the Kanawha County Commission.

Due to the non-remittance of rents to the WVWDA, on August 27, 2018, RDA sent a letter to Mr. Wellford and to Corotoman asserting breach of contract. The letter immediately removed Corotoman from its role as Landlord and further provided that, unless the breach was fully cured within twenty days, Corotoman's involvement in the Ticketmaster premises would be

5

terminated altogether. Both Corotoman and the Plaintiffs agree that the letter was self-executing, and that no further action would be necessary to eliminate Corotoman following the expiration of the twenty-day period.

Following the issuance of the August 27th letter, the WVWDA and the RDA cooperated to function as Landlord for the Ticketmaster premises. Rent was collected and the WVWDA Loan payments were made. The Bank Loan was eventually satisfied. The WVWDA and the RDA have absolute ownership of the Ticketmaster premises, and they have since Corotoman was expelled. The RDA owns the land and the building and has the right to collect rents, while the WVWDA holds the real estate and an assignment of rents as collateral. Corotoman's option to repurchase has been extinguished.

At Mr. Wellford's deposition on July 14, 2021, he asserted his Fifth Amendment right against self-incrimination over 400 times. Among other things, he declined to identify his signature on the REPA, declined to discuss his involvement with the development and construction of the Ticketmaster premises, refused to identify the person responsible for collecting the rent payments and remitting them to the WVWDA, and refused to account for the whereabouts of the rents collected but not remitted properly.

**B.**     **Arguments of the Parties**

The Plaintiffs' Complaint seeks relief based on seven theories: (1) breach of contract, (2) unjust enrichment, (3) conversion, (4) embezzlement, (5) fraud, (6) false representations, and (7) obtaining money by false pretenses. The Plaintiffs additionally ask that Mr. Wellford's debts be declared non-dischargeable under 11 U.S.C. §§ 523(a)(2), (a)(4), and/or (a)(6). The Plaintiffs' Complaint lists twelve counts, and in the Plaintiffs' MSJ, they ask for summary judgment on four of those counts: (i), (ii), (iii), and (v) – Breach of the REPA (Arrearages), Breach of the REPA (Foregone Real Estate Taxes), Breach of Commercial Guaranty Agreement, and Conversion.

The Defendants' Answer and Counterclaim include eight counts: (1) Breach of the REPA (Corotoman's Repurchase Rights), (2) Breach of the REPA (Representations, Warranties, Covenants, and Agreements), (3) Breach of the REPA (Corotoman's Rights), (4) Breach of the REPA (Good Faith and Fair Dealing), (5) Tortious Interference with a Contract, (6) Tortious Interference with a Contract, (7) Civil Conspiracy, and (8) Intentional Infliction of Harm.

Corotoman's MSJ simply asks that this Court to find that it has no liability for any amounts owed to the Plaintiffs and to disallow the claims of the WVWDA and the RDA against Corotoman's bankruptcy estate.

## II.

**A.    Governing Standard**

Federal Rule of Civil Procedure 56, made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bank. P. 7056. The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party must do so by offering "sufficient proof[ ] in the form of admissible evidence" rather than relying solely on the allegations of her complaint. *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

The Court must "view the evidence in the light most favorable to the [nonmoving] party." *Tolan v. Cotton*, 572 U.S. 650, 657, 134 S. Ct. 1861, 1866(2014) (internal quotation omitted). "The court . . . cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015). In general, if "an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their

credibility, summary judgment is not appropriate." Fed. R. Civ. P. 56 (advisory committee's note to 1963 amendment).

B.     Analysis

The Court will deal with the summary judgment motions in turn. It will begin with the Plaintiffs' MSJ and will then move to the Corotoman MSJ to address any remaining issues.

### *The Plaintiffs' Motion for Summary Judgment*

The Plaintiffs ask for a ruling as a matter of law on four matters: breach of the REPA for both failure to remit payments to the WVWDA and for failure to pay foregone real estate taxes, breach of the commercial guaranty agreement for failure to remit payments to the WVWDA, and conversion of the payments that were not remitted to the WVWDA.

The first three matters are based on breach of the REPA and the Wellford Guaranty contracts. According to the REPA, Corotoman

> agreed to sell the [Ticketmaster] Premises to RDA, but to continue to perform the duties of the Landlord under the [Ticketmaster] Lease, to indemnify RDA, to repurchase the [Ticketmaster] Premises upon expiration or termination of the [Ticketmaster] Lease, to reimburse Kanawha County for real estate taxes foregone at the end of the lease term, and Wellford has agreed to guarantee performance or Corotoman.
> . . .
> Corotoman hereby agrees to strictly and timely perform all of the obligations of the Landlord in the [Ticketmaster] Lease, and to pay all amounts payable by the Landlord under the [Ticketmaster] Lease, and Corotoman is hereby granted the sole and exclusive right to receive all rent and other payments due Landlord under the [Ticketmaster] Lease and to perform all of the obligations of Landlord under the [Ticketmaster] Lease so long as such obligations are met and fulfilled. Corotoman shall protect, defend, indemnify, and hold harmless RDA from all claims, demands, penalties, fines, and other costs incurred by RDA in connection with the review, approval and assignment of the [Ticketmaster] Lease, the acquisition of the [Ticketmaster] Premises and the funding of the Long Term Loans including any attorneys fees, expert witness fees, and other costs incurred in connection with the [Ticketmaster] Lease, excepting only claims by Corotoman against RDA for intentional breach of, or default in or under this Agreement.
> . . .

8

> Corotoman shall promptly pay on behalf of RDA all amounts due on the Long Term Loans. Corotoman is hereby authorized and directed to, and shall, perform all of the obligations of RDA under the Loan Agreements . . . by and between RDA and [the WVWDA], and RDA and [First Community Bank, N.A.], in connection with the Long Term Loans.
>
> . . .
>
> Corotoman hereby reserves the prior and exclusive right at any time to repurchase the [Ticketmaster] Premises . . . upon and in consideration of the (i) payment in full by Corotoman of the [WVWDA] Loan, (ii) payment or assumption of the Bank Loan, and (iii) payment of foregone real estate taxes . . . . Corotoman shall have the obligation to repurchase the [Ticketmaster] Premises for the same consideration and on the same terms as set forth [above] at such time as the Ticketmaster Lease expires, terminates, or is otherwise no longer effective.
>
> . . .
>
> At such time as Corotoman purchases the [Ticketmaster] Premises from RDA, Corotoman will pay to the Sheriff of Kanawha County a sum of money equal to but not to exceed the lesser of either (i) or (ii) hereafter: (i) an amount equal to real property taxes . . . for each year . . . that the [Ticketmaster] Premises is owned by the RDA and neither Corotoman nor Tenant is assessed or otherwise required to pay real property taxes with respect to the [Ticketmaster] Premises, or (ii) one half of the difference between (a) the fair market value of the [Ticketmaster] Premises and (b) the sum of the pay off amount (principal amounts only) of the Loan Term Loans . . .
>
> . . .
>
> Wellford joins herein to personally guarantee and adopt directly, jointly, and several as his own personal obligation, the obligations and duties of Corotoman herein.

There are, importantly, no provisions which address a breach of the REPA by any party to the contract.

The pertinent facts are exceedingly straightforward. The parties had a valid contract which required Corotoman to perform certain duties, which Mr. Wellford guaranteed. No one has contested the validity of the REPA. Satisfactory consideration was exchanged when the REPA was executed. It is a valid contract. Corotoman promised to "promptly pay on behalf of RDA all amounts due on the Long Term Loans," and Mr. Wellford personally guaranteed that promise. Corotoman was to collect rents from Ticketmaster and then remit the amount necessary to make the payments

9

on the WVWDA Loan. Corotoman, in the Corotoman MSJ admits as much, stating that "[a]t some point, Corotoman, Inc. stopped making loan payments to the [WVWDA], and the local bank. These payments were not made, although Corotoman, Inc., continued to collect the rent from Ticketmaster."

The Plaintiffs' Count I asserts that the Defendants breached the REPA by, among other things, failing to remit the collected rental payments to the WVWDA. The material facts are not disputed, and it is clear as a matter of law that the Defendants breached the REPA by failing to remit payments to the WVWDA as contemplated in the contract.

The Plaintiffs request in Count I damages in the amount of $2,021,097.35, which is set forth in the WVWDA's proof of claim filed in Mr. Wellford's bankruptcy case. They argue that they are due damages resulting from Corotoman's failure to pay the WVWDA loan down. However, the Plaintiffs also acknowledge that the actual amount of the payments which were collected by the Defendants but not remitted to the WVWDA is approximately $1,560,000. In studying the WVWDA's proof of claim (no. 3) filed in Mr. Wellford's bankruptcy case, it appears that the WVWDA Loan balance as of the petition date was $1,966,894.55 and the costs associated came out to $54,202, and those two numbers total $2,021,097.35. That is the basis for the Plaintiffs' damages calculation.

The REPA specifically states that Corotoman will hold RDA harmless for any costs incurred in connection with the acquisition of the Ticketmaster premises and the funding of the Long Term Loans, including attorneys' fees and other costs. It further states that "Corotoman shall promptly pay on behalf of RDA *all amounts due on the Long Term Loans*" and "Corotoman . . . shall perform all of the obligations of RDA under the Loan Agreements by and between RDA and [the WVWDA], and RDA and [First Community Bank, N.A.], in connection with the Long Term Loans." That plain contractual language leads the Court to understand that, pursuant to the REPA, Corotoman

10

promised to pay, on behalf of RDA, all amounts due by RDA on the Long Term Loans. Corotoman, and Mr. Wellford by the Wellford Guaranty made themselves responsible for the entirety of the Long Term Loans. The plain and undisputed facts support this finding. Therefore, the Court will grant summary judgment to the Plaintiffs as to Count I, in the amount of $2,021,097.35, which represents the loan balance as of the date of Mr. Wellford's filing, along with associated and appropriate costs.

The Plaintiffs' Count II asserts that the Defendants breached the REPA by failing to pay the foregone real estate taxes. Pursuant to the REPA, Corotoman agreed to repurchase the Ticketmaster premises from RDA once the Ticketmaster lease expired, was terminated, or became otherwise no longer effective. Or, to activate its right to repurchase the Ticketmaster premises, Corotoman would have to have paid the foregone real estate taxes. The Plaintiffs assert that, simply because the Defendants are in material breach of the REPA, RDA is entitled to the foregone real estate tax funds as calculated in the REPA. Because Corotoman was only *obligated* to purchase the premises *once the Ticketmaster Lease terminated*, and would at that point be responsible for paying the foregone real estate taxes, the Plaintiffs opine that those foregone real estate tax funds should be considered damages. However, the Court is not so willing to accept that argument. Nowhere in the REPA does it state that Corotoman will be responsible for the foregone real estate tax payments if the REPA is materially breached. The foregone real estate tax payments are contingent upon only two things: the outcome of the Ticketmaster Lease or Corotoman's fulfillment of the three requirements necessary to activate its right to repurchase the Ticketmaster premises. While the damages for breach of the REPA for failure to remit the Long Term Loan payments easily and naturally follow from that breach, damages in the form of the foregone real estate taxes do not. As of now, the Ticketmaster Lease is still in place between Ticketmaster and RDA. As it were, RDA still owns the Ticketmaster premises, and, thus, no foregone real estate taxes have yet come due. Whether the Plaintiffs would eventually prevail on this count at a trial on the merits is a question for

11

the future; what the Court knows now, though, is that Count II is not proper for summary judgment. There remain issues of fact as to whether the parties contemplated payment of the foregone real estate taxes as a result of a breach of the REPA, and whether those funds could properly be considered damages. Accordingly, the Court will not grant summary judgment to the Plaintiffs as to Count II.

The Plaintiffs' Count III asserts that Mr. Wellford breached the Wellford Guaranty when he and Corotoman failed to deliver payments on the Loan Term Loans. Mr. Wellford, through his guaranty, unconditionally guaranteed:

> (i) the due and punctual payment and performance of all of Borrower's obligations under the [Ticketmaster] Lease . . . and
> (ii) the due and punctual payment of all present and future indebtedness evidenced by or arising out of the Agreement and any note issued by the Borrower thereunder . . . including but not limited to, the due and punctual payment of principal of [sic] and interest on that certain Promissory Note of the Borrower payable to the order of the Lender dated August 5, 1999, in the principal amount of $3,000,000 . . . .

Because the Court has already found that Corotoman breached the REPA, it follows unequivocally that Mr. Wellford also breached his guaranty by not making timely payments to the WVWDA on behalf of Corotoman as its guarantor. Therefore, the Court will grant summary judgment to the Plaintiffs on Count III.

Plaintiffs' Count V asserts that the Defendants converted the rent collected from Ticketmaster in violation of West Virginia law. The Fourth Circuit has instructed bankruptcy courts to apply the choice-of-law rules of the state in which they sit when deciding state law claims under their pendant jurisdiction. *Gorman v. Northern Trust Co. (In re Gorman)*, No. 17-ap-10, 2017 WL 2838105, at *4 (Bankr. N.D. W. Va. June 31, 2017) (citing *Compliance Marine, Inc. v. Campbell (In re Merritt Dredging Co.)*, 839 F.2d 203, 205 (4th Cir. 1988)). Furthermore, "absent a compelling federal interest which dictates otherwise, bankruptcy courts should apply the choice-of-law rules of the state in which they sit whether adjudicating bankruptcy-related disputes or disputes over a

debtor's interest in property." *Gorman*, 2017 WL 2838105 at *4 (discussing *Merritt Dredging Co.*, 839 F.2d at 206 and *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496 (1941)). This Court sits in West Virginia, the contract was executed in West Virginia, and the alleged conversion occurred in West Virginia. Thus, this Court will apply West Virginia conversion law.

In West Virginia, conversion is "[a]ny distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith . . . ." *Rodgers v. Rodgers*, 184 W. Va. 82, 95 (1990). Importantly, "it is not necessary that the wrongdoer apply the property to his own use," and it is not necessary to show that the wrongdoer "acted in bad faith or [was] negligent." *Id.* Thus, "when such conversion is proved the plaintiff is entitled to recovery irrespective of good or bad faith, care or negligence, knowledge or ignorance." *Miami Coal Co., Inc. v. Hudson*, 175 W. Va. 153, 160 (1985) (citing *Pine and Cypress Manufacturing Co. v. American Engineering and Construction Co.*, 97 W. Va. 471, 472 Syl. Pt. 3 (1924)).

Both parties agree that RDA owns the Ticketmaster premises and has the right to collect the rents. The rents were assigned to the WVWDA as of August 5, 1999. Corotoman was simply obligated, by contract, to collect those rents and remit them to the WVWDA. Both parties also agree that Corotoman at some point stopped remitting the rents to the WVWDA, although it had continued to collect the funds from Ticketmaster. Conversion simply requires a distinct act of dominion wrongfully exerted over the property of another, in denial of his rights. Conversion clearly occurred here: Corotoman exerted wrongful dominion over the rents that were to be collected on behalf of the RDA and sent to the WVWDA pursuant to the assignment of rents. Although Mr. Wellford has not offered any explanation as to where the monies went or what they were used for, the Court's decision is unaffected. Conversion requires no proof that the property was used by the wrongdoer for his own use or that the wrongdoer acted negligently or in bad faith. The simple fact that Corotoman took the rents and did not remit them is enough.

13

Corotoman collected and failed to remit approximately $1,560,000 in rental payments. There is, however, a hiccup in the amount that the Plaintiffs are requesting pursuant to the conversion claim. While the Plaintiffs ask for the total amount of rents collected as damages, the Court refers back to the fact that Corotoman had been entitled to keep a certain amount of the rental payments each month. As stated previously, the monthly rent payments exceeded the amount due on the WVWDA Loan. Thus, Corotoman would rightfully retain that overage for the purpose of compensation, along with payment of expenses such as snowplowing and janitorial services. Thus, the Court cannot conclude that the entirety of the $1,560,000 is properly considered damages. Therefore, the Court will grant summary judgment to the Plaintiffs on Count V as to liability, but not as to the amount of damages. The damages will be decided at trial.

In addition to their own counts, the Plaintiffs ask this Court to grant summary judgment in their favor based on the Defendants' counterclaims. The Plaintiffs argue that, because they did not breach the REPA or the Wellford Guaranty, the Defendant's counterclaims must be denied as a matter of law. Although it is true that no genuine issue of material fact exists, as Corotoman did not argue with any of the pertinent facts, and Mr. Wellford did not file a response or objection, it does not simply follow that the Plaintiffs are entitled to summary judgment on the Defendants' Counterclaims. The second half of the standard for summary judgment is that the movant shows they are entitled to judgment as a matter of law. Although there may not be any facts in question, this Court finds that it simply does not have *enough* facts to adjudicate summary judgment for claims based on Corotoman's repurchase rights and the Proposed Deal.

The Defendants' Counterclaims are predicated on their assertion that the Plaintiffs breached the REPA by refusing to enter into the Proposed Deal, which the Defendants argue would have satisfied the three predicate requirements for Corotoman's right to repurchase the Ticketmaster premises. The Plaintiffs claim that they had no obligation to enter into the Proposed Deal, and further

14

argue that the Proposed Deal would not have fully satisfied the requirements for repurchase. The facts surrounding the Proposed Deal are far murkier than those the Court considered when evaluating the Defendants' breach of the REPA for non-remittance of rents to the WVWDA. Thus, the better course of action is to undertake conclusive development of the evidentiary record, with regards to this matter, at trial. The Plaintiffs' request for summary judgment on all Counterclaims of the Defendants is denied.

Finally, in Response to the Plaintiffs' MSJ, Corotoman points the Court towards what it considers the Plaintiffs' failure to mitigate damages. Corotoman uses this as a basis to contest any liability to the Plaintiffs, stating that the lack of mitigation deprives the Plaintiffs of the right to make a claim. West Virginia indeed does recognize the general rule that a party injured by the breach of a contract has the duty to mitigate its damages. *Chesser by Hadley v. Hathaway*, 190 W. Va. 594, 600 (1993). The burden of proof is on the defendant to show that the plaintiff failed to mitigate his damages. *Smithson v. United States Fidelity and Guaranty Co.*, 186 W. Va. 195, 206 (1991). The plaintiff is not required to undertake undue or oppressive burdens to fulfill his duty to mitigate. *City National Bank of Charleston v. Wells*, 181 W. Va. 763, 773 (1989). Instead, an injured person is only required to protect himself from the injurious consequences of the wrongful act by the exercise of ordinary effort and care and moderate expense. *Chesser*, 190 W. Va. at 594.

The Plaintiffs, when the Defendants failed to remit the rental payments to the WVWDA, sent a letter to the Defendants terminating Corotoman's duties under the REPA. At that point, the RDA was able to make sure that the payments went exactly where they were supposed to be going. Other than pursuing damages and terminating the contract between the parties, this Court is unsure of any other mitigation that would not be an undue or oppressive burden. The Court finds that the Plaintiffs met the minimum required for mitigation under West Virginia law.

15

### *Corotoman's Motion for Summary Judgment*

Corotoman asks this Court for summary judgment by requesting that it find that the WVWDA and the RDA do not have a valid proof of claim against the bankruptcy estate of Corotoman. If the Court decides that the entities do have a claim against Corotoman and/or Mr. Wellford, Corotoman requests that this Court decide the amount of that claim. Corotoman notes in the Corotoman MSJ that the Plaintiffs are seeking to establish Corotoman's liability, and also appear to be establishing liability against Mr. Wellford individually from the same nucleus of facts and on the basis of the Wellford Guaranty.

Corotoman argues that, because its interests in the Ticketmaster premises were extinguished by the August 27, 2018 letter asserting breach of contract, it no longer has any liability to the RDA or the WVWDA. Essentially, Corotoman likens the "ouster" letter to a foreclosure and argues the letter terminated all rights of Corotoman to repurchase the Ticketmaster premises pursuant to the contractual formula. Corotoman believes that the RDA has been fully compensated for the breach by "ousting" Corotoman from its repurchase rights. And under foreclosure law, those repurchase rights now must be considered equal to the fair market value of repurchase rights. Corotoman asserts that, when the August 27, 2018 letter was sent, the RDA took all the benefits of the transfer of the building, and no further deficiency is due. Corotoman appears to believe that it is not liable for any damages contemplated for breach of the REPA because it compares its situation to a deficiency action arising out of a foreclosure.

The situation herein appears to the Court to be very different to that of a foreclosure. This is not a secured lender foreclosing on collateral; in fact, it is quite different. The August 27th, 2018 letter eliminated Corotoman as the vehicle through which the rents were remitted to WVWDA and asserted a breach of the REPA. It was not an attempt by the RDA to foreclose on the one tiny interest Corotoman had (the right to repurchase); instead, it was an act announcing the breach and

16

terminating the contract. Furthermore, Corotoman held no possessory interest in the Ticketmaster premises that could have been foreclosed upon by the RDA. Corotoman's loss of its right to repurchase was simply what it was forced to give up for breaching the contract. That does not negate the right of the other parties to the REPA to ask for damages arising out of the breach. Corotoman would ask this Court to find the rights of the other parties to the REPA akin to the rights of a lender to pursue a deficiency claim after a foreclosure. Essentially, Corotoman wants this Court to extinguish the Plaintiffs' rights in any recourse over and above Corotoman's loss of its right to repurchase the Ticketmaster premises; to foreclose, as it were, the Plaintiffs' ability to pursue Corotoman just like lenders are prevented from going after any deficiency balance on their loans if foreclosures are effectuated in a manner outside of West Virginia statutory law. That is not a step this Court is willing to take. The situations are too different – like comparing apples and salmon: both are healthy foods, but they are distinctly different. Accordingly, this Court denies Corotoman's Motion for Summary Judgment.

### III.

Pursuant to the foregoing discussions, it is

**ORDERED** that the Plaintiffs' Motion for Partial Summary Judgment be, and is hereby, **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that summary judgment be, and is hereby, granted on Plaintiffs' Counts I and III.

**IT IS FURTHER ORDERED** that summary judgment be, and is hereby, denied on Plaintiffs' Count II.

**IT IS FURTHER ORDERED** that summary judgment be, and is hereby, granted as to liability on Plaintiffs' Count V.

**IT IS FURTHER ORDERED** that summary judgment be, and is hereby, denied as to the Defendants' Counterclaims.

**IT IS FURTHER ORDERED** that Corotoman's Motion for Summary Judgment be, and is hereby, **DENIED.**